2010 OK CIV APP 105

**Teresa TORTORELLI and Robert L. Tortorelli, Plaintiffs/Appellants,**

v.

**MERCY HEALTH CENTER, INC., Kimberly Smith, M.D., Oklahoma Orthopedics, Inc., d/b/a Oklahoma Orthopedics Incorporated, and IsoTis OrthoBiologics, Inc., Defendants/Appellees,**

**GenSci Regeneration Laboratory Sciences, Inc., IsoTis, S.A., successor to GenSci OrthoBiologics, Inc., The OrthoBiologics Technology Company, and SMC Ventures, Inc., successor to GenSci Regeneration Sciences, Inc., Defendants.**

**No. 106,073.**

Court of Civil Appeals of Oklahoma, Division No. 1.

June 4, 2010.

Certiorari Denied Oct. 4, 2010.

◉⇝14(7)

Rex D. Brooks, Oklahoma City, OK, for Plaintiffs/Appellants.[1]

Ryan S. Wilson, Hartzog, Conger Cason & Neville, Oklahoma City, OK, for Defendant/Appellee Mercy Health Center, Inc.

Daniel K. Zorn, Stephen R. Palmer, Collins, Zorn & Wagner, P.C., Oklahoma City, OK, for Defendant/Appellee IsoTis Orthobiologics, Inc.

L. Earl Ogletree, Lane O. Krieger, Wiggins Sewell & Ogletree, Oklahoma City, OK, for Defendants/Appellees[2] Dr. Kimberly Smith and Oklahoma Orthopedics, Inc.

WM. C. HETHERINGTON, JR., Judge.

¶ 1 Teresa M. Tortorelli (Plaintiff) and Robert L. Tortorelli (collectively, Appellants) appeal judgments in favor of IsoTis Orthobiologicals, Inc. (IsoTis), Mercy Health Systems, Inc. (Mercy), Oklahoma Orthopedics, Inc. (Oklahoma Orthopedics) and Dr. Kimberly S. Smith, M.D. (Dr. Smith).[3] Appellants argue the trial court erred as a matter of law in sustaining motions for summary judgment based on application of the learned intermediary doctrine. They argue reversible error also occurred in jury instructions, by the allowance of argument during an opening statement, denial of a motion to amend their petition and for a continuance, denial of their motion for a directed verdict, and in both allowing and refusing to allow the presentation of certain evidence regarding their claims against Dr. Smith.

¶ 2 The judgments in favor of IsoTis and Mercy following the grant of their respective motions for summary judgment based upon the learned intermediary doctrine are AFFIRMED. No reversible error is shown or any error is harmless as to other alleged grounds for reversal, and the judgment entered on the jury's verdict in favor of Dr. Smith and Oklahoma Orthopedics accordingly is AFFIRMED.

---

1. Only Mr. Brooks entered an appearance as counsel on appeal. However, Robert P. Powell, also appeared as Plaintiffs/Appellants' counsel at hearings on motions for summary judgment which resulted in judgments made a part of this appeal. According to Appellants' reply brief, Mr. Powell "left right after thanksgiving (sic), 2007."

2. Jamie K. Bruehl of Rife & Walter, LLP, Oklahoma City, Oklahoma, appeared as counsel for Oklahoma Orthopedics, Inc. at hearings on the motions for summary judgment resulting in judgments made a part of this appeal.

3. Appellants named several defendants who do not appear in this appeal. According to the record, GenSci Regeneration Laboratory Services, Inc., is the former name of GenSci OrthoBiologics, Inc., a Washington corporation, and The OrthoBiologics Technology Company is a trade name for GenSci Regeneration Sciences, Inc., a Canadian corporation, (collectively, the

GenSci defendants). In late 2001, GenSci Regeneration Sciences, Inc. and GenSci OrthoBiologics, Inc. filed for bankruptcy, but those proceedings were dismissed in late July of 2003, conditioned upon approval by shareholders or a final Canadian court order of a merger agreement between GenSci Regeneration Sciences, Inc. and IsoTis, S.A., a Swiss corporation. Subsequently, the following occurred: (1) Appellants dismissed without prejudice their causes of action against the GenSci defendants, (2) GenSci Regeneration Sciences, Inc. changed its name to SMC Ventures, Inc., (3) IsoTis, and GenSci OrthoBiologics merged to form IsoTis OrthoBiologics, Inc., (4) Appellants were granted leave to amend their petition to again name as defendants the GenSci defendants, and (5) Appellants were granted leave to amend their petition to add IsoTis OrthoBiologics, Inc., IsoTis, S.A., and SMC Ventures, Inc. as defendants.

## Facts

¶ 3 Plaintiff went to her primary care doctor due to pain in her back and knees. She was referred to an orthopedic clinic, where a doctor took x-rays of her back and right knee. One x-ray showed a tumor in Plaintiff's right leg, and she was referred to Dr. Smith,[4] an orthopedic surgeon who concentrates her practice in tumor removal surgery.

¶ 4 On November 8, 2000, Dr. Smith removed the bone tumor from Plaintiff's right tibia during surgery at Mercy Health Center. During the surgery, the following were placed in Plaintiff's right leg: a tibial nail, a bolt (also referred to as a rod), bone cement, and Dynagraft allograft[5] bone putty. The last of these items, the bone putty, is a product of IsoTis and it became the focus of this litigation.

¶ 5 According to Dr. Smith, she used bone putty because a large area was removed during the tumor removal surgery, which put Plaintiff at risk for a later fracture of her tibia, and the bone putty promotes bone formation across the area of tumor removal. She did not use a bone graft from Plaintiff herself because of concerns about infection at a second surgical site.

¶ 6 Plaintiff had redness and swelling in her right leg following the November 8, 2000 surgery, but she was discharged from Mercy's hospital on Saturday, November 11, 2000, with instructions to change the wound dressing at least once a day, keep the dressing dry, begin showering only after the wound stopped draining, and to contact her doctor if her condition worsened. She developed more swelling and redness throughout her right leg and went to an emergency room at Presbyterian Hospital late in the next evening on Sunday, November 12, 2000. She was released from the emergency room early on Monday November 13, 2000, given antibiotics, advised she had cellulitis,[6] and told to consult Dr. Smith.

¶ 7 Plaintiff went to a scheduled Tuesday, November 14, 2000 follow up appointment with Dr. Smith and was re-admitted to Mercy that day. She was treated with high doses of antibiotics, and the swelling and redness began to subside but it did not resolve. Dr. Smith suspected Plaintiff either had a deep infection at the surgical site or a reaction to the bone putty.

¶ 8 On November 22, 2000, Dr. Smith surgically removed all the bone putty, did a radical irrigation of the wound, and debrided the area. Following this surgery, Plaintiff's cellulitis resolved within 48 hours, but she continued to have swelling and redness with resolution over the next few days. Dr. Smith made a postoperative diagnosis of cellulitis with a failure to respond to intravenous antibiotics, which she found consistent with a possible allergic reaction to the bone putty or the bone cement. Plaintiff was discharged on November 26, 2000. Plaintiff contended she continued to have pain and was diagnosed about a month later as having reflex sympathetic dystrophy disease (RSD), also referred to as complex regional pain syndrome, as a result of her reaction to the bone putty. From March 15, 2001 until June 14, 2005, Plaintiff was treated for RSD[7] by Dr. Scott Mitchell, who is board certified in anesthesiology with additional certification in pain management.

¶ 9 Appellants filed suit on November 4, 2002, and filed their Fifth Amended Petition

4. Initially, Oklahoma Orthopedics disclaimed any liability for Dr. Smith's medical practice. Dr. Smith's office is the same building as Oklahoma Orthopedics, it processed her billing, and she appeared in an Oklahoma Orthopedics brochure which Plaintiff testified she obtained during her visit. Oklahoma Orthopedics remained a named defendant throughout the litigation.

5. An allograft is tissue from another person. The allograft bone putty in this case was made from demineralized bone tissue IsoTis obtained from an American Associations of Tissue Banks accredited tissue bank.

6. Cellulitis is an "[i]nflammation of cellular or connective tissue." *Stedman's Medical Dictionary*, 273 (25th ed., 1990).

7. Dr. Mitchell also treated Plaintiff for pain radiating from her neck, which he described, in a video deposition played for the jury at trial, as having "nothing to with the RSD." Plaintiff also received "medical management," *i.e.*, prescriptions, for pain management from Dr. Bruce Mackey.

June 21, 2005.[8] They alleged they sustained damages based on breach of the standard of care due Plaintiff by Dr. Smith's failure to obtain consent to use "allograph bone putty made from cadaver paste" during the tumor removal surgery and stated claims based upon products liability under strict liability, negligence, and breach of warranty theories. Robert Tortorelli, Plaintiff's husband, alleged he sustained damages due to a loss of consortium.

¶ 10 Initially, Appellants argued Plaintiff had informed Dr. Smith of her allergy to iodine and they based claims for damages upon the use of iodine to clean Plaintiff's skin prior to surgery or in either the preparation of the bone putty or the bone cement. Defendants denied these uses of iodine had occurred. Following discovery, the claims based upon iodine usage were not pursued by Appellants.

¶ 11 In 2008, IsoTis[9] and Mercy filed separate motions for summary judgment in which each argued the learned intermediary doctrine applied and each had no liability. After judgment was entered in favor of each of them, the case later was tried to a jury on the issue of informed consent against Dr. Smith and Oklahoma Orthopedics, the sole remaining defendants.[10] Following three days of trial, the jury returned a verdict in favor of Dr. Smith and Oklahoma Orthopedics. Appellants raise several allegations of error in their appeal, and we address them in turn.

### Motions for Summary Judgment

¶ 12 Appellants argue the judgments entered in favor of IsoTis and Mercy following summary adjudication proceedings require reversal because inadequate warnings rendered the learned intermediary doctrine in-

applicable. Mercy and IsoTis claim the judgments were properly granted because they were shielded from liability under the learned intermediary doctrine. Mercy also argued Appellants' "attempt to create sham facts" by their assertion of a new theory of liability in response to IsoTis's motion for summary judgment should be rejected, and it was entitled to judgment.

¶ 13 "When on motion for summary judgment it appears from pleadings, affidavits, depositions, admissions, answers to interrogatories or other instruments properly before the Court that there are no genuine issues as to material facts or that admitted facts justify but a single inference therefrom, it is not error to grant summary judgment." *Perry v. Green,* 1970 OK 70, ¶ 0, 468 P.2d 483. "On motion for summary judgment there can be no trial of fact issues since its function is to determine whether there are any genuine issues as to material facts. Such motion should therefore be denied if under the evidence reasonable men might reach different conclusions from undisputed facts." *Id.* ¶ 27, 488–89. (Citation omitted.) All inferences and conclusions to be drawn from the evidentiary materials must be viewed in a light most favorable to Plaintiff. *Ross By and Through Ross v. City of Shawnee,* 1984 OK 43, 683 P.2d 535.

¶ 14 On review of summary judgments, the appellate court may "substitute its analysis of the record for the trial court's analysis" because the facts are presented in documentary form. *Loffland Brothers Company v. Overstreet,* 1988 OK 60, ¶ 15, 758 P.2d 813, 817. The appellate court may not weigh evidence, but it may review the evidence presented to determine whether there is a factual dispute. *Stuckey v. Young Exploration Company,* 1978 OK 128, 586 P.2d 726. Summary judg-

---

**8.** Appellants' initial petition also named as defendants McBride Clinic Incorporated, Howmedica Osteonics, Stryker Corp., and Stryker Sales Corporation. The claims against these four defendants were dismissed without prejudice within the first six months this lawsuit was pending.

**9.** IsoTis also filed an earlier motion for summary judgment, on July 21, 2006, which was granted as to the plaintiffs' breach of implied warranty of merchantability claims and denied as to claims based upon defects in manufacturing of the bone

putty and in the warning. A journal entry was filed December 17, 2007. The appeal does not address this 2007 order.

**10.** According to the trial court and Appellants' counsel, no issue of battery was alleged or pled because of the one-year statute of limitations for such a cause of action. Appellants also presented some testimony from Plaintiff about the condition of her right leg at the time of her discharge following the first surgery.

ment should be granted only if it is perfectly clear that there is no material fact at issue. *Northrip v. Montgomery Ward and Co.*, 1974 OK 142, 529 P.2d 489. "Where different interpretations of the facts may be drawn as to a particular fact question, the issue should be presented to a jury." *Manora v. Watts Regulator Co.* 1989 OK 152, ¶ 9, 784 P.2d 1056, 1060.

¶ 15 Appellants argued the bone putty was delivered with inadequate warnings which made it a defective product and made IsoTis liable for Plaintiff's injury due to allergic reaction to its product. Appellants claim Mercy also is liable for inadequate warnings, even though it might not have participated in formulating those warnings, because it supplied the bone putty and therefore participated in its chain of distribution.

¶ 16 In *Kirkland v. General Motors Corporation*, 1974 OK 52, 521 P.2d 1353, the Oklahoma Supreme Court adopted the theory of strict liability in tort set forth in Restatement (Second) of Torts, § 402A (1965). Under this liability theory, one who sells a product in a defective condition unreasonably dangerous to the user or consumer or to his or her property is liable for physical harm caused by the product if the seller is engaged in the business of selling that product and the product is expected to and does reach the user and consumer without substantial change in the condition in which it is sold.

■■■ ¶ 17 "The manufacturer of a product has a duty to warn the consumer of potential dangers which may occur from the use of the product when it is known or should be known that hazards exist." *McKee v. Moore*, 1982 OK 71, ¶ 4, 648 P.2d 21, 23. To recover, a plaintiff must establish both that injury was caused by the product and by a failure to warn of a possible detrimental reaction. *Id.* ¶ 5, 23–24. "In a strict liability action it is immaterial to the plaintiff's case

that the defect in the product was not caused by the distributor. The liability of the manufacturer and distributor is co-extensive, even though the distributor was not responsible for the presence of the defect." *Braden v. Hendricks*, 1985 OK 14, ¶ 12, 695 P.2d 1343, 1350.

■■ ¶ 18 The learned intermediary doctrine is an exception[11] to the manufacturer's duty to warn an ultimate consumer and shields a manufacturer from liability if it has adequately warned a prescribing physician of a danger which is the cause of the consumer's injury. *Edwards v. Basel Pharmaceuticals*, 1997 OK 22, 933 P.2d 298. Certain products, including prescription drugs and other items requiring a prescription or physician's order are inherently dangerous or incapable of being made safe, but serve a public benefit. *Eck v. Parke, Davis & Company*, 2001 10CIR 787, ¶ 12, 256 F.3d 1013, 1017. "It is the physician's duty to inform himself of the qualities and characteristics of those products which he administers or prescribes for use of his patients, and to exercise his judgment, based on his knowledge of the patient as well as the product." *McKee v. Moore*, 1982 OK 71, ¶ 8, 648 P.2d 21, 24.

■■■ ¶ 19 The burden for plaintiffs is no different than in an ordinary negligence case when the learned intermediary doctrine is applied because the failure to give adequate warnings is what makes a product defective. *Lindsay v. Ortho Pharmaceutical Corporation*, 637 F.2d 87 (2nd Cir.1980). Under the learned intermediary doctrine, a manufacturer's liability is directly related to the adequacy of the warning provided, and if the doctor is adequately warned the product is not defective. *Id.* at 91.[12] "The adequacy of warnings is determined by state law." *Edwards*, 1997 OK 22, ¶ 17, 933 P.2d at 303.

---

11. Recognized exceptions to the learned intermediary doctrine itself, such as warnings required for mass immunizations or when the federal Food and Drug Administration has mandated direct warnings be given to consumers, are not at issue here.

12. Similarly, a "knowledgeable user" exception is recognized in some cases. The rationale with such knowledgeable users is that "knowledge of the danger is equivalent to prior notice." *Billiar v. Minnesota Mining and Manufacturing Company*, 623 F.2d 240, 243 (2nd Cir.1980). This is so because "[n]o one needs notice of that which he already knows." *Borowicz v. Chicago Mastic Company*, 367 F.2d 751, 758 (7th Cir.1966).

¶ 20 IsoTis contended the warnings adequately warned Dr. Smith of the potential for an allergic reaction such as that experienced by Plaintiff. Mercy contended it had no liability for allegedly inadequate warnings in the materials provided with the bone putty.

### IsoTis's Motion

■ ¶ 21 In support of its motion for summary judgment, IsoTis provided an affidavit by Dr. Smith in which she stated she: (1) had used the bone putty on numerous occasions, was aware of its purpose and of contraindications and precautions, (2) "was familiar with received, read, comprehended and understood" the "Directions for Use" insert prior to Plaintiff's surgery, (3) had "reviewed and comprehended" the specific warning that "the possibility of an antigenic reaction is present in any allograft," (4) was "aware and comprehended" the implantation of the bone putty "could create an antigenic reaction in the Plaintiff," (5) had exercised "independent informed judgement" and "independent learning and experience," and, (6) had, "based upon [her] independent informed judgement as a medical doctor" after having "evaluated the potential risks involved, including potential antigenic reactions," concluded the benefits of using the bone putty were appropriate care for Plaintiff. In reply to Plaintiff's response and objection to its motion for summary judgment, IsoTis also cited deposition testimony of Dr. Smith in which she stated she had used bone grafts some 40 to 50 times during her residency, fellowship, and the first two and half years of her practice and described how "antigenic" means a reaction of the body and includes an allergic reaction, because "[a] immune response is considered to be a reaction."

■ ¶ 22 The bone putty insert states "[t]he reaction of the body to any allograft is not completely understood." In opposition to IsoTis's motion for summary judgment, Appellants made a bare allegation IsoTis's warnings are inaccurate and misleading "re-garding reactions not being understood." Bare, speculative, and conclusory allegations of possible inadequacies in warnings are insufficient to create a genuine factual issue under the learned intermediary doctrine. *See Krasnopolsky v. Warner–Lambert Company*, 799 F.Supp. 1342 (E.D.N.Y.1992). "[M]ere contention that facts exist or might exist is not sufficient to withstand summary judgment. The party responding to a motion for summary judgment has an obligation to present something which shows that when the date of trial arrives, he will have some proof to support his allegations." *Davis v. Leitner*, 1989 OK 146, ¶ 12, 782 P.2d 924, 926. In the absence of *evidence* contradicting a warning so as to render it false, nothing is presented requiring trial by a jury.

■ ¶ 23 To meet this burden, Appellants offered deposition testimony of biomedical research scientist Tara Tabatabaie (a non-doctor) to the effect that such reactions were understood at a cellular level, and then Appellants posed arguments based upon Dr. Smith's understanding of the meaning of the phrase "not completely understood."

■ ¶ 24 The question whether *all* potential reactions are "completely understood" poses a red herring. A fact is material for purposes of summary judgment if its proof would have the effect of establishing or refuting one of the essential elements of cause of action. *Hadnot v. Shaw*, 1992 OK 21, 826 P.2d 978. The Directions for Use for the bone putty contain the warning: "Although the production technique is designed to eliminate antigenic properties of the product, the possibility of such a reaction is present with any allograft." [13] The facts Appellants attempt to prove through the research scientist are insufficient because even if proven, the information offered does not contradict, refute or render false the warning the bone putty presented a risk of antigenic reaction. Plaintiffs mis-characterized Dr. Smith's testimony about her familiarity with bone putty

---

13. According to an exhibit to IsoTis's reply to Appellants' response to their motion for summary judgment, when asked at deposition if the phrase "really is not clear," Dr. Smith replied "I don't know what else I would expect it to say."

She also testified she was aware of the content of the Directions for Use which contained the warnings prior to when she used the bone putty for Plaintiff's surgery.

and the risk of an antigenic reaction posed by its use.

¶ 25 The material fact at issue was whether the proximate cause of Plaintiff's injury, here an antigenic reaction to the bone putty, was a risk disclosed to Dr. Smith. It was. Judgment in favor of IsoTis based upon the learned intermediary doctrine is not precluded on this basis.

¶ 26 Appellants also argued a "sufficient testing for bone protein and marrow was not performed rendering the product defective and unreasonably dangerous" and Defendants' arguments fail as a matter of law because Dr. Smith did "no independent research or reading." This argument demonstrates a misconception about the learned intermediary doctrine. A major underlying assumption of the learned intermediary doctrine is that a product has properties rendering it dangerous so as to require a doctor's prescription or order for its use. Argument about the particulars of the manufacturing *process* are not relevant when applying the learned intermediary doctrine. IsoTis's duty as a manufacturer under this doctrine was not to provide an in-depth education to trained physicians in the underlying biochemistry in bone putty production but to identify and warn of risks.

¶ 27 To invoke a defense to liability under the learned intermediary doctrine, a manufacturer seeking its protection must provide sufficient information to the learned intermediary of the risk subsequently shown to be the proximate cause of a plaintiff's injury. Here, IsoTis warned of the risk of an antigenic reaction from using its product, Dr. Smith knew an antigenic risk was possible,

she knew of such warnings for bone putty, she considered the risk posed by using the bone putty, she decided it was appropriate to use the bone putty based upon her experience with bone putty and Plaintiff's needs, and the Plaintiff had an antigenic reaction. The judgment in favor of IsoTis premised upon application of the learned intermediary doctrine is AFFIRMED.

*Mercy's Motion*

¶ 28 Mercy argued it may not be held liable for inadequate warnings if IsoTis's motion for summary judgment is granted because Appellants' claim against it is dependent upon their claim the bone putty lacked proper warnings.[14] Having found the learned intermediary doctrine applicable as to IsoTis, the same doctrine applies in favor of Mercy. However, our inquiry into Mercy's liability does not end with the application of this doctrine.

¶ 29 Appellants raised a new theory for Mercy's liability in response to its motion for summary judgment, claiming negligence in the discharge of Plaintiff following the tumor removal surgery. Mercy argued Appellants were attempting to create sham facts through the affidavit. Mercy argued neither negligent discharge nor informed consent issues were stated in any of Appellants' petitions, including the most recent, a fifth amended petition. More importantly, it argued, during the deposition of Appellants' medical expert Dr. Henry Hug conducted just a week previously, though questioned specifically about his criticisms of Smith and Mercy, he voiced none based on standard of care.[15] During an April 24, 2008 hearing, the

---

14. Mercy also distinguishes an Ohio case, *Saylor v. Providence Hospital,* 113 Ohio App.3d 1, 680 N.E.2d 193 (1996), relied upon by Plaintiffs, which turns upon an Ohio statute imposing supplier liability based upon negligence or supplier misrepresentations and independent supplier liability for failing to warn of a lack of FDA approval of a device. There is no similar statute here and these theories of liability are not applicable to the facts of this case.

15. For example, Dr. Hug testified in his April 15, 2008 deposition as follows:

Q. Did you find any departures whatsoever of Dr. Smith from acceptable standards of care

with respect to what you may think they are for an orthopedic surgeon?

A. No, I did not.

Dr. Hug's only standard of care "criticism" of Mercy at that time was a speculation, based upon his own experiences prior to retiring from his thoracic and vascular surgery clinical practice in 1987, that some surgeon who *may* have been associated with Mercy *might* have recommended the bone putty to Smith. When asked if, other than this "potential criticism," he had "no other criticisms whatsoever of Mercy Hospital and its employees or agents; correct?" He replied, "Correct."

trial court observed that the fifth amended petition does not state a negligence claim against Mercy, trial was scheduled on May 19th, and denied Appellants' request to amend their petition.

¶ 30 When determining whether an affidavit may be disregarded because it attempts to create a sham issue of fact, the Court may consider whether the party was cross-examined during earlier testimony, whether the party had access to the evidence at the time of earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Ishmael v. Andrew*, 2006 OK CIV APP 82, ¶ 16, 137 P.3d 1271, 1276. A trial court may disregard an affidavit purporting to create an issue of fact by directly contradicting prior deposition testimony during which the deponent was both cross-examined and had access to the information forming the basis for the affidavit at the time of the deposition. *Savage v. Burton*, 2005 OK CIV APP 106, 125 P.3d 1249. Such is the case here. Dr. Hug's 2002 report states he reviewed Plaintiff's medical records. Those medical records contain the same information about the condition of her leg which Plaintiff raised at deposition and upon which he based his premature discharge standard of care criticisms due to premature discharge after the tumor removal surgery. The trial court did not err in concluding no material fact was presented, and rejecting the affidavit. The order granting Mercy's motion for summary judgment is AFFIRMED.

### Motion to Amend Petition and for Continuance

¶ 31 Appellants argue the trial court erred by denying their May 8, 2008 "motion to amend petition by stating specific negligent actions by stating them in the pre-trial order," and by denying them a continuance to allow additional discovery. As before, Appellants claim they should have been allowed to amend their petition to state claims based upon negligence in the standard of care due

to premature discharge following the tumor removal surgery because they only discovered the basis for amendment after their expert, Dr. Hug, read [16] Plaintiff's October 11, 2005 deposition testimony following his own April 15, 2008 deposition.

¶ 32 "[T]he trial court has always possessed discretion over whether to allow an amendment to a pleading" subject to 12 O.S.2001 § 2015(A)'s requirement "that leave to amend be given freely if justice requires." *Prough v. Edinger, Inc.*, 1993 OK 130, ¶ 8, 862 P.2d 71, 73. Whether to permit an amendment of the pleadings is left to the discretion of the trial court. *Andersen v. Fellers*, 1998 OK CIV APP 53, ¶ 15, 960 P.2d 851, 855.

¶ 33 A trial court's decision to deny a motion to amend will not be overturned, however, absent a showing of abuse of the court's discretion under the circumstances. *Prough*, 1993 OK 130, ¶ 8, 862 P.2d at 73. A trial court acts within its discretion when a justifying reason exists to deny a request. *McDermott v. Sentry Life Ins. Co., Inc.*, 2000 OK CIV APP 115, ¶ 27, 15 P.3d 508, 516. "Some of the factors to consider in evaluating whether a time delay is undue are: 1) the number of previous amendment requests; 2) the timing of the request (before or after discovery is closed and a trial date set); and 3) the length of time the movant was aware of the applicability of the amendment." *Prough*, 1993 OK 130, ¶ 10, 862 P.2d at 73.

¶ 34 When determining whether the trial court abused its discretion in denying Appellants' motion to amend, we consider the particular facts and circumstances of this case. According to Dr. Hug's September 9, 2002 Report, he reviewed Plaintiff's records from Mercy, the emergency room, x-rays, physical therapy, and office visits with treating doctors. Mercy's records include descriptions of Plaintiff's leg on the day of her first discharge and the identities of Mercy employees, including the resident who facilitated her

---

16. It is unclear whether the deposition was provided earlier and Dr. Hug either did not read it or he read it and did not recall the facts he later cited as a basis for his premature discharge standard of care criticisms.

**562**

discharge.[17] His standard of care criticism at the time was premised upon Plaintiff's history of allergy to iodine and based upon an alleged use of "radiopaque bone paste" which "most likely is manufactured with cadaver bone ... mixed with an iodinated compound to make it radiopaque." In an April 29, 2003 report, he repeated this criticism and recommended obtaining information whether the bone putty "contains iodine or some other allergen." Appellants dropped allegations based upon the presence of iodine following discovery conducted in 2007.

¶ 35 Dr. Hug had no criticisms based upon standard of care when he was deposed on April 15, 2008. According to Appellants, Dr. Hug read Plaintiff's 2003 deposition testimony only after that deposition. Dr. Hug was deposed again on May 14, 2008, and questioned about Plaintiff's discharge following the first surgery. He was critical of the discharge because "from the medical records it would appear that there was some inflammation and drainage from the incision."

¶ 36 At a May 16, 2008 hearing on the motion to amend and motions in limine, Defendant pointed out that all the names of Mercy personnel claimed to have prematurely discharged Plaintiff were in the medical records provided to Dr. Hug before his 2002 report, this information had been in Appellants' possession during the six years Dr. Hug had been involved in the case, and Dr. Hug did not raise a standard of care issue in any of three written reports he wrote prior to his May 8, 2008 affidavit. Defendants argued Appellants had failed to conduct a diligent investigation about information in their possession and motion to amend only 11 days before scheduled trial would prejudice their clients.[18] The trial court also noted the information had long been in Appellants' and their expert's possession.

¶ 37 "[A] trial court acts within its discretion if a justifying reason exists for the denial of the movant's request." *McDermott v. Sentry Life Insurance Company., Inc.* 2000 OK CIV APP 115, ¶ 28, 15 P.3d 508, 516. Like the Court in *McDermott,* we find relevant the observation "[a]lthough ... leave to amend shall be freely granted, a party must act with due diligence if it intends to take advantage of the Rule's liberality." *U.S. v. Midwest Suspension and Brake,* 49 F.3d 1197, 1202 (6th Cir.1995). Diligence was lacking here.

¶ 38 The trial court did not abuse its discretion by denying Appellants' motion to amend given the records in their possession for more than six years and that the motion was filed after discovery had closed and just eleven days before trial was scheduled. Consequently, the trial court also did not abuse its discretion in denying a continuance to allow additional discovery.

### The Trial

¶ 39 Appellants claim the trial court "erred as a matter of law" in allowing certain evidence and in refusing to allow certain evidence, in allowing argument during Defendants' opening statement, and in the use of various exhibits. We address these allegations in turn.

¶ 40 Evidentiary rulings by the trial court regarding relevance and admissibility are addressed to the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a showing of abuse of discretion. *American National Bank & Trust Company of Sapulpa v. BIC Corporation,* 1994 OK CIV APP 70, 880 P.2d 420. "Decisions regarding relevance of evidence and its alleged prejudice to the other party will not be overturned absent an abuse of discretion." *Mills v. Grotheer,* 1998 OK 33, ¶ 3, 957 P.2d 540, 541. "A judgment will not be reversed for error in the rejection of evidence unless it appears from an examina-

---

**17.** We say "facilitated" because the record contains evidence the resident discharged Plaintiff as a result of an order or instructions from Dr. Smith. According to statements by Appellant's counsel at hearing on May 16, 2008, his office's records indicate they had earlier provided the transcript to Dr. Hug, but if he received it, he lost it when he moved.

**18.** Appellants' counsel, in an apparent effort to rebut the allegation of prejudice, in fact buttressed the Defendants' claim of a lack of diligence by stating, "It's always been in the record. They had them for years. They have always known about it. *I didn't know about it.*" (Emphasis added.)

tion of the entire record that such error had probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." *Samara v. State*, 1964 OK 79, ¶ 0, 398 P.2d 89, 90, *cert. den. and appeal dismissed*, 381 U.S. 354, 85 S.Ct. 1556, 14 L.Ed.2d 681 (1965).

■■■ ¶ 41 Appellants argue it was error to exclude testimony by Robert Tortorelli that RSD was the reason Plaintiff received physical therapy and to prevent him from testifying about the reasons she had incurred certain other medical bills.[19] We disagree. Mr. Tortorelli testified the bills were those he and Plaintiff contended resulted from the failure to inform them of the "cadaver bone putty." There was no error in allowing him, when testifying as a member of Plaintiff's family, to identify bills from medical or therapeutic providers for her treatment they allege are connected to the subject of litigation. 12 O.S.Supp.2002 § 3009. The medical records were subject to a stipulation between the parties as to identification, however, witnesses not testifying as an expert are limited to opinions and inferences "not based on scientific, technical or other specialized knowledge." 12 O.S.Supp.2002 § 2701(3). It was not error to limit his testimony by preventing him from offering his opinion about the medical causation or diagnoses[20] necessitating Plaintiff's various treatments when such testimony would require "scientific, technical or other specialized knowledge."

■■■ ¶ 42 Appellants claim the trial court erred by allowing Defendants to use a blow up of a portion of testimony as an aid during opening statements and this error caused prejudice and reversible error. The trial court allowed the use as a demonstrative aid to Defendants' description of anticipated testimony. The testimony in the blow up is part of the recorded testimony of Plaintiff's treating physician Dr. Scott Mitchell which was later presented to the jury as part of their own case in chief. Appellants do not articulate how they were prejudiced by testimony from their own witness other than to complain they needed to move for the admission of one of their own exhibits prior to allowing the jury to view it when they used it to question Plaintiff. Requiring a party to follow proper procedure by laying a foundation for a document offered as part of proof in their case in chief and moving for its admission into evidence prior to allowing a jury to view it does not present reversible error.

■■■ ¶ 43 They also claim there was reversible error due to the injection of argument during Defendants' opening statement. Based upon the record citations for these alleged errors, the offending statements were, "Please don't leave your common sense at the door when you come into this courtroom and decide the issues," "Now, Dr. Smith and I trust you to lay sympathy aside. I anticipate there will be tears in this courtroom," and, "We ask you to lay all sympathy aside, judge the facts as you see them from the witness chair." Appellants' objections to the first and third statements were sustained, and their objection to the second statement was overruled. Appellants did not request any admonishments or other corrective action by the trial court following its rulings.

■■■■ ¶ 44 Counsel have wide latitude in both opening statements and closing arguments, subject to the trial court's control. *Lerma v. Wal–Mart Stores, Inc.*, 2006 OK 84, 148 P.3d 880. There must be a showing counsel's conduct substantially influenced the

---

19. Appellants' cite for this proposition 12 O.S. 2001 §§ 2401 and 2402, which address relevance. Relevance was not the issue when the testimony was proposed. We address the reasons and argument which were presented to the trial court.

20. According to his testimony, Mr. Tortorelli is a surface water hydrologist with a doctorate in civil engineering. Some medical records listed no diagnosis and only reflected the services provided and the dates of services. Other medical records contained diagnostic codes or labels. Some of these medical records indicated RSD as a diagnosis but some also listed an additional diagnosis for medical conditions not claimed to relate to this litigation, *i.e.*, pain management records for RSD *and* for cervical disc disease and lumbar disc disease. Some bills were for pain management but included a diagnosis that Plaintiff's RSD was "in remission." The records were all admitted into evidence for the jury's consideration.

jury's verdict and/or denied a fair trial. *Id.* ¶ 20, 885. A court abuses its discretion when it uses its discretion to an end or purpose justified neither by reason nor by evidence. *Patel v. OMH Medical Center, Inc.*, 1999 OK 33 ¶ 20, 987 P.2d 1185, 1194, *cert. denied*, 528 U.S. 1188, 120 S.Ct. 1242, 146 L.Ed.2d 100 (2000). If it appears there has been misconduct in a trial, the aggrieved party may move the court to declare a mistrial, but by failing to do so "will be deemed to have taken his chances with the jury." *Lawton Transit Mix, Inc. v. Larson*, 1969 OK 83, ¶ 0, 455 P.2d 696, 697. Appellants did not pursue any remedy to ameliorate the effect of the remarks, did not move for mistrial, and have not shown the remarks to have caused prejudice, influenced the jury's verdict or denied them a fair trial. Reversal on this theory is denied.

¶ 45 Similarly, no reversible error is presented by the trial court's refusal, following an objection by Defendants, to allow Plaintiff's friend, Sherry Henley, to read a nurse's note from her first hospitalization to the jury. Henley reviewed the record only after her deposition and the only reason given for allowing her to read the note was the alleged use of notations familiar to nurses. Although she was a registered nurse, Henley appeared as a fact witness who had seen Plaintiff only during her second hospitalization. She was not qualified as an expert, and was never a Mercy employee. Further, the medical records containing the nurses' notes were not yet admitted into evidence at the time Appellants asked Henley to read them aloud to the jury. In support of this allegation of error, Appellants cite 12 O.S.2001 § 2401 and § 2402, which address the relevancy of evidence. That was not the issue regarding the nurses' notes. Like with the testimony of Robert Tortorelli,

the record was subject to a stipulation *as to identification*, but such a stipulation is not a waiver of the need to establish a proper foundation for admissibility or to move for admission of evidence prior to publishing it to a jury.[21]

¶ 46 Appellants argue it was error to exclude from evidence the video deposition testimony of Jocelyn Nguyen, an IsoTis research associate, and the further use of the same video deposition to rebut Dr. Smith's testimony.[22] The trial court reviewed the testimony and determined it may have been relevant to products liability issues no longer part of the case but was not relevant to the informed consent issues being tried. "It is not error to refuse to admit evidence which does not prove or disprove any fact in issue in the trial of a lawsuit." *Marcum v. Zaring*, 1965 OK 125, ¶ 0, 406 P.2d 970. 971.

¶ 47 Appellants argue medical records of Dr. Barney Blue[23] and "Dr. King" should not have been admitted into evidence because they weren't identified on witness lists before trial. A careful reading of the record shows Dr. Blue's records were used for impeachment of Plaintiff's descriptions of the health complaints and problems she attributed to the RSD and claimed resulted from surgery performed by Dr. Smith.

¶ 48 Prior inconsistent statements of a record may be used for impeachment of testimony given at trial, 12 O.S.Supp.2002 § 2613, and records may be used to refresh a witness's memory on matters relating to direct testimony upon cross-examination, 12 O.S.Supp.2002 § 2612. That is what occurred here. After laying a foundation, Defendants' counsel asked Plaintiff about Dr. Blue's June 18, 1999 medical record listing complaints of fatigue, swollen feet and body,

**21.** In the trial transcript, Appellant's counsel indicated he would make an offer of proof, and then he stated simply: "The offer of proof is page 13 of Plaintiffs' Exhibit No. 8." We need not address this offer. This page, which contains two nurses' notes, later was admitted into evidence as part of Plaintiffs' Exhibit No. 8.

**22.** Appellants' argument the testimony would rebut testimony by Dr. Smith "after she testified that the antigenic reaction that the package insert [warns about] was a good thing and desir-

able" mis-characterizes that testimony. While asking Dr. Smith, about reactions to the bone putty and if it was a "good thing" to induce a reaction, she replied: "To have an osteoinduction [bone formation stimulating] process, yes. To have an adverse antigenic reaction, no."

**23.** Plaintiff identified Dr. Blue as a doctor who had manipulated her back due to pain. She did not recall seeing a "Dr. King."

arm and leg pain, and "knots" in her arms and legs, all of which were complaints she testified were from RSD resulting from surgery. Contrary to Appellants' claim these records were admitted into evidence, the record cited by them shows the trial court sustained an objection to records of a "Dr. King," and did not allow his medical records to be used for impeachment purposes and, more importantly, Dr. Blue's records also were *not* admitted into evidence. Further, several symptoms and problems Plaintiff attributed to RSD [24] also are described in other medical records predating her surgery to which no objections were interposed. No error is presented in the use of Dr. Blue's records for impeachment.

■ ¶ 49 Appellants claim reversible error in the refusal to allow a wider range of testimony within the expertise of research scientist Tara Tabatabaie,[25] who has a Ph.D. in chemistry. Prior to trial, Defendants filed a motion in limine asking, in part, for a prohibition of medical or other expert testimony not "within the expert's realm of expertise," and the trial court reserved the issue until trial. At trial, Defendants objected to allowing expanded testimony from Dr. Tabatabaie because she did not have a medical degree, she was not qualified to testify about medical causation, and her testimony, if allowed, would be cumulative because Dr. Hug covered medical causation about RSD. The trial court then limited her testimony to that "from her background as a chemist" about allergic reaction to bone putty. On this record, no reversible error is stated regarding that determination on the scope of her competence to testify.

■ ¶ 50 Appellants argue the trial court allowed "rank hearsay" by Dr. Smith about bone putty manufacturing, a process it was not shown she had observed. Dr. Smith was asked for her "understanding" about how bone putty is manufactured and testified in response how "[t]he overall process, I understand, is they harvest bone steriley from cadaver bone that is then steriley processed down to the bone proteins only" into "basically a liquid or powder form" which is reconstituted into sheets or a matrix for use by surgeons like herself. Appellants did not object based upon hearsay but instead objected that she was "not qualified" to answer the question. This objection goes to witness competency. Reversal may not be obtained based on arguments and issues raised for the first time on appeal. *Kepler v. Strain*, 1978 OK 52, 579 P.2d 191.

■ ¶ 51 Appellants argue it was error to exclude affidavits signed by Dr. Smith which were attachments to motions for summary judgment by IsoTis and Mercy, citing 12 O.S.Supp.2002 § 2613. At trial, they argued the affidavits were admissible as prior inconsistent statements by Dr. Smith.

■ ¶ 52 The criteria for the admission of prior inconsistent statements to attack the veracity or credibility of a witness are governed by the 12 O.S.Supp.2002 § 2607 and § 2613. Before allowing evidence of a witness's prior inconsistent statements, the trial court *"must* satisfy itself that the proffered testimony is sufficiently inharmonious with the declarant's in-court testimony and is relevant to a *non-collateral* matter. A proper foundation must be laid before the extrinsic impeachment evidence may be admitted." *Crussel v. Kirk*, 1995 OK 41, ¶ 8, 894 P.2d 1116, 1119. (Emphasis in original; footnotes omitted.)

¶ 53 Here, Appellants cross-examined Dr. Smith about alleged inconsistencies between

---

24. When asked about what problems she attributed to RSD, Plaintiff listed swollen feet, severe pain, lack of sleep, stinging, burning, problems walking (having to use a cane or walker) and digestive system problems due to pain medications. The conditions and symptoms present prior to surgery included pain unresponsive to medication, fatigue, joint pain, joint stiffness and swelling, muscle cramps and pain, back pain, difficulty walking, depression, and numbness or tingling.

25. At the hearing on motions in limine, Appellants' counsel advised she would testify the bone putty was unreasonably dangerous because it was not tested for bone marrow. The trial court found she was qualified to testify about what can cause allergic reaction and about antigens but not about medical causation and diagnosis of Plaintiff's condition or about danger because that was part of the former product liability cause of action and it was not relevant to informed consent.

statements in her affidavits and her trial testimony. For example, her August 30, 2007 affidavit, which was attached as an exhibit to IsoTis's Motion for Summary Judgment, stated she "was familiar with, received, read, and understood" warnings for the bone putty "prior to" Plaintiff's first surgery. She testified at trial how she had read those warnings but did not recall precisely *when* that occurred prior to Plaintiff's first surgery. The trial court examined the affidavits and determined they were not inconsistent with Dr. Smith's trial testimony. We agree, and find no reversible error is presented.

## Motion for Directed Verdict

¶ 54 Appellants argue the trial court erred as a matter of law in overruling their motion for a directed verdict made at the end of trial. Defendants argue denial of the motion was proper because the record contained evidence in their favor.

¶ 55. "We review the denial of a motion for directed verdict *de novo.*" *Computer Publications, Inc. v. Welton,* 2002 OK 50, ¶ 12, 49 P.3d 732, 735. As taught in *Messler v. Simmons Gun Specialties, Inc.,* 1984 OK 35, ¶ 28, 687 P.2d 121, 130:

> When the trial court considers a demurrer to the evidence or a motion for directed verdict, it must consider as true all evidence and all reasonable inferences favorable to the party against whom the demurrer or motion is directed, and disregard any conflicting evidence which is favorable to the demurrant or movant. Either motion should be overruled in the absence of proof which tends to show any right to recover.

¶ 56 " 'Informed consent,' as it was adopted in *Scott v. Bradford,* [1979 OK 165], 606 P.2d 554 (Okla.1980), entails three basic elements: 1) nondisclosure, 2) causation, and 3) injury." *Smith v. Karen S. Reisig, M.D., Inc.,* 1984 OK 56, 686 P.2d 285, 288. "However, a physician has no duty to inform a patient of risks known by the patient." *Goss v. Oklahoma Blood Institute,* 1990 OK CIV APP 14, ¶ 28, 856 P.2d 998, 1007 (citing *Spencer By*

*and Through Spencer v. Seikel,* 1987 OK 75, ¶ 12, 742 P.2d 1126, 1129).

¶ 57 Dr. Mitchell, who treated Plaintiff for RSD, testified he did some research on the syndrome and from it concluded the most likely cause of Plaintiff's RSD was the bone tumor itself. Plaintiff agreed that she knew allergic reactions were possible and gave Dr. Smith information about her own allergic reactions to iodine and penicillin. Appellants' adult son testified in their case in chief that he heard Dr. Smith say, prior to the first surgery, "we're going to remove this, and we're going to put in this paste." This evidence could be considered as evidence in defense of elements Appellants were required to prove and as supporting judgment for Defendants. There was not an "absence of proof" in Defendants' favor, and it was for the jury to decide whether Appellants met their burden of proving all necessary elements for their cause of action.

## Jury Instructions

¶ 58 Appellants argue the trial court erred because, although it instructed the jury on the issue of informed consent, by instructing the jury on the issue of negligence the issue of informed consent was essentially removed from the jury's consideration. Appellants not only did not object to the negligence instructions, they proposed these same instructions given the jury.[26] Nothing in this record suggests a probability the jury was confused or misled and thereby reached a different result by the giving of the negligence instructions in conjunction with the instruction on informed consent. No reversible error is presented.

¶ 59 Appellants also argue "in view of the evidence produced at trial of previous medical problems, the Court should have also given OUJI 4.10 on Aggravation of Pre-Existing Conditions." The case was not pled or tried as a case for aggravation of a pre-existing condition and Appellants did not request such an instruction. "[B]y the standard announced in *Woodall [v. Chandler Ma-*

---

**26.** Nor, strictly speaking, is an error of law presented. A claim based on lack of informed consent is "a cause of action sounding in negligence" for breach of a duty. *Scott v. Bradford,* 1979 OK 165, ¶ 11, 606 P.2d 554, 557.

*terial Co.,* 1986 OK 4, 716 P.2d 652], there is not a probability that the jury would have reached a different result if it had been given an instruction on the aggravation of a pre-existing condition. Therefore, the trial court did not err by denying the injured party's request to include OUJI–Civ. 4.10." *Bierman v. Aramark Refreshment Services, Inc.,* 2008 OK 29, ¶ 24, 198 P.3d 877, 885. The same applies here.

¶ 60 Appellants further allege error in the trial court's failure to adopt their Requested Instruction No. 1. This proposed instruction included allegations about the claims Plaintiff sought to add *via* the motion to amend the pleadings and gave Appellants' version of the case issues. In arguing "[t]he trial Court failed to even apprise the jury of the issues they were to try by refusing Plaintiff's (sic) Requested Jury Instruction No. 1," Appellants overstate the duty of the trial court. The trial court has a "duty to instruct on the fundamental issues of a case," however "[i]n giving instructions, the trial court is not required to frame issues, but it must state the law correctly." *Smicklas v. Spitz,* 1992 OK 145, ¶ 11, 846 P.2d 362, 367. The proposed instruction would have served to confuse and mislead the jury about the issues in the case and it was properly rejected.

¶ 61 Appellants also claim it was error not to give requested instructions on Plaintiff's "mental pain and suffering, past and future," on her "loss of time," and "loss of enjoyment of life" as elements in fixing her damages. The jury could not have been mislead by not being instructed in these elements for setting damages in light of the verdict in favor of Defendants. Any error was harmless.

### Conclusion

¶ 62 No reversible error has been shown with respect to the trial court's determinations regarding admissibility or inadmissibility of evidence or testimony, the application of the learned intermediary doctrine, instruction of the jury, or the denial of Appellants' eleventh-hour motion to amend the pleadings. The judgment entered on the jury's

verdict in favor of Defendants is AFFIRMED.

BUETTNER, P.J., and HANSEN, J., concur.